## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

CALVIN BURKE,

     Plaintiff,

v.

DALE GLASS, et al.,

     Defendants.

)
)
)
)
)
)
)
)
)
)

No. 4:14-CV-2107 RLW

## MEMORANDUM AND ORDER

This matter is before the court on Defendants' Motion for Summary Judgment (ECF No. 111). This matter is fully briefed and ready for disposition.

## BACKGROUND

Burke's lawsuit arises from his confinement at the Medium Security Institution ("MSI"), also known as the "Workhouse." Burke brings claims against Defendants in their individual capacities pursuant to 42 U.S.C. §1983 and 42 U.S.C. §2000cc. Plaintiff's Second Amended Complaint contains eight separate counts: Count I "42 U.S.C. §1983"; Count II "First Amendment Violations"; Count III "Fourth Amendment Violations," *i.e.*, the strip search policy at MSI was unconstitutional; Count IV "Due Process Violation of the Fifth Amendment"; Count V "Deliberate Indifference to Safety and Health"; Count VI "Custom and Usage"; Count VII "Violation of Equal Protection and Due Process Under the Fourteenth Amendment," and Count VIII "42 USC §1983".

Burke was incarcerated at MSI from November 6, 2014 through September 14, 2015. (Defendants' Statement of Uncontroverted Material Facts ("DSUMF"), ECF No. 111-1).[1] Burke alleges that the accommodations at MSI were unsatisfactory because MSI was unsanitary and the heating system malfunctioned. Burke also complains about the quality of the food service at MSI because it did not conform to applicable and nutritional and caloric standards, and defendants interfered with his access to kosher meals. Burke alleges that inmates at MSI were encouraged to engage in "gladiator style battles." Burke alleges that Defendants' strip search policy is unconstitutional because he was searched in the presence of "homosexuals, sexual predators, and known sex offenders," without privacy partitions, and that the searches occurred on a floor made wet from leaking toilets and urinals.

The undisputed material facts, however, demonstrate that Burke's claims are unfounded. During Burke's incarceration, the boiler system would occasionally fail, but was always repaired within an hour. (DSUMF, ¶2). Inmates were not without heat or hot water for any significant amount of time. (DSUMF, ¶3). While the plumbing fixtures (sinks, toilets, urinals) at MSI occasionally leaked or clogged, these problems were always promptly repaired. (DSUMF, ¶4).

The St. Louis City Division of Corrections has an established policy 3.3.3, Inmate Grievances, which requires that inmates first submit an Informal Resolution Request form, or "IRR." (DSUMF, ¶¶6-7). The Policy further provides that certain issues are "non-grievable," *i.e.*, cannot be addressed within the inmate grievance system; these include policies and procedures of the Division of Corrections, conditions not affecting the inmate personally, and frivolous or repetitive complaints. (DSUMF, ¶8). If the inmate is dissatisfied with the outcome

---

[1] The Court previously held that all facts alleged in Defendant's Motion for Summary Judgment are deemed admitted. (ECF No. 128).

of the IRR process, he is provided with a grievance form and may submit that form within five business days. (DSUMF, ¶9).

Defendants Weber and Fields consistently responded to Burke's complaints and requests submitted via IRR through the grievance system. (DSUMF, ¶10). Burke was denied grievance forms for non-grievable issues only in accordance with the grievance policy. (DSUMF, ¶ 11). During his incarceration at MSI, Burke abused the grievance system by repeatedly filing frivolous and repetitive grievances and by sending a folded, full food tray to Weber. (DSUMF, ¶12).

On December 17, 2014, Burke was approved to receive kosher meals. (DSUMF, ¶13). This authorization was revoked on February 17, 2015. (DSUMF, ¶14). Prior to March 2015, Burke was re-approved for kosher meals. (DSUMF, ¶15). Burke received kosher-certified meals for the remainder of his confinement at MSI. (DSUMF, ¶16). Defendants Fields and Edwards were not responsible for approval of special diet requests; rather, the Corizon doctors or the chaplain were responsible for approving such requests. (DSUMF, ¶40).

At MSI, strip searches must be conducted "to locate and seize contraband in order to ensure the safety and security of the facility, the Correctional Officers, and the inmates. There is no effective alternative to the strip search policy." (DSUMF, ¶21). Privacy partitions or screens are not provided for inmates during strip searches "to ensure the safety and security of the Correctional Officers conducting the searches." (DSUMF, ¶22). During the strip searches "inmates were never made to stand in human waste." (DSUMF, ¶23).

During his incarceration, Burke received adequate nutrition and medical care. (DSUMF, ¶25). Problems with the boilers and plumbing were repaired within a reasonable amount of time

and insect extermination was regularly conducted. (DSUMF, ¶26). Burke suffered no significant harm to his health while incarcerated at MSI. (DSUMF, ¶27).

Burke was kept in administrative segregation for 34 days, from December 17, 2014 until January 20, 2015. (DSUMF, ¶29). Before being confined to Administrative Segregation, Burke received a pre-deprivation hearing. (DSUMF, ¶28). The disciplinary reports against Burke were substantiated and Burke's punishment was determined after his hearing. (DSUMF, ¶30).

Burke maintained his approximate weight during his incarceration. (DSUMF, ¶31). Burke did not suffer any exacerbation of vision problems during his confinement. (DSUMF, ¶32). Burke suffered no significant harm as a result of a result of the cleanliness or temperature at MSI, the condition of the sinks, toilets, and urinals, and the light and noise, presence of insects, etc. (DSUMF, ¶33). Burke never sought medical attention related to other inmates smoking near him. (DSUMF, ¶34). In fact, Burke was a drug and tobacco user at the time of his confinement at MSI. (DSUMF, ¶35).

At MSI, whether an inmate receives out-of-cell exercise is dictated by the administrative segregation and recreation policies. (DSUMF, ¶36). Correctional officers working in the administrative segregation area have the discretion to deny out-of-cell exercise for inmates exhibiting disruptive behavior. (DSUMF, ¶37).

## DISCUSSION

## I. MOTION FOR SUMMARY JUDGMENT

### A. Standard of Review

The Court may grant a motion for summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment

as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Citrate*, 477 U.S. 317, 322 (1986); *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011). The substantive law determines which facts are critical and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Only disputes over facts that might affect the outcome will properly preclude summary judgment. *Id.* Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.*

A moving party always bears the burden of informing the Court of the basis of its motion. *Celotex Corp.*, 477 U.S. at 323. Once the moving party discharges this burden, the nonmoving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the "mere existence of some alleged factual dispute." Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 248. The nonmoving party may not rest upon mere allegations or denials of his pleading. *Id.*

In passing on a motion for summary judgment, the Court must view the facts in the light most favorable to the nonmoving party, and all justifiable inferences are to be drawn in his favor. *Celotex Corp.*, 477 U.S. at 331. The Court's function is not to weigh the evidence but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'" *Torgerson*, 643 F.3d at 1042 (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).

**B. Count I: 42 U.S.C. §1983**

Count I alleges that Burke's constitutional rights were violated by Defendants. "The two requisites for a § 1983 cause of action are: (1) an allegation that the conduct complained of subjected the complainant to a deprivation of rights, privileges, or immunities secured by the

Constitution and laws of the United States, and (2) an allegation that the conduct complained of was done or caused to have been done by a person acting under the color of law." *Jennings v. Davis*, 476 F.2d 1271, 1275 (8th Cir. 1973) (citing *Basista v. Weir*, 340 F.2d 74, 79 (3rd Cir. 1965)). Defendants claim that Burke's claim fails as a matter of law and Defendants are entitled to qualified immunity.

### a. Respondeat Superior Liability for §1983 Claims

The Court enters judgment in favor of Defendants Gray, Glass, Edwards, Harry, Fields, Diggs, Earvin, and Rea ("Supervisor Defendants") because their roles in Plaintiff's claims were supervisory and there is no *respondeat superior* liability for §1983 claims. *See Ellis v. Norris,* 179 F.3d 1078, 1079 (8th Cir.1999) (§ 1983 complaint must allege facts supporting any individual defendant's personal involvement in or responsibility for alleged constitutional violations); *Brown v. Arkansas Dep't of Human Servs.*, 452 F. App'x 690, 692–93 (8th Cir. 2011) (same). "Because vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1948, 173 L.Ed.2d 868 (2009). Thus, "each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Id.* at 1949.

Burke has not alleged that the Supervisor Defendants ordered, directed, or even suggested that any correctional officers violate Burke's constitutional rights. *Parrish v. Ball*, 594 F.3d 993, 1002 (8th Cir. 2010). Even Burke's claims that he reported violations and sent grievances to these defendants do not establish liability for purposes of §1983. In fact, during discovery, Burke was asked about Defendants' personal conduct with regards to Burke's claims. (ECF No. 111-4, ¶15). In response, Burke identifies conversation and letters provided to these officers, but

does not identify any particular actions performed by them that violated Burke's constitutional rights. (ECF No. 111-5, ¶5). As a result, the Court grants summary judgment in Defendants' favor because Burke has not articulated Supervisory Defendants' direct involvement in any alleged violations of Burke's constitutional rights.

### b. Qualified Immunity

"In a § 1983 action, state actors may be entitled to qualified immunity." *McRaven v. Sanders,* 577 F.3d 974, 980 (8th Cir. 2009)( *quoting Riehm v. Engelking,* 538 F.3d 952, 962 (8th Cir. 2008)); *Smith v. Kansas City, Missouri Police Dep't*, 586 F.3d 576, 579 (8th Cir. 2009). Qualified immunity is "'*immunity from suit* rather than a mere defense to liability.'" *Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (quoting *Mitchell,* 472 U.S. at 526, 105 S.Ct. 2806) (emphasis in original); *Robbins v. Becker*, 715 F.3d 691, 693 (8th Cir. 2013). "Qualified immunity shields government actors from suit unless their conduct violates clearly established constitutional or statutory rights that a reasonable person would have known." *Smith*, 586 F.3d at 580 (citing *Henderson v. Munn,* 439 F.3d 497, 501 (8th Cir. 2006), *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). "To overcome the defense of qualified immunity, a plaintiff must show: (1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of the deprivation." *Howard v. Kansas City Police Dep't.,* 570 F.3d 984, 988 (8th Cir. 2009). This court may first address either prong. *Id. (citing Pearson v. Callahan,* 555 U.S. 223, 129 S.Ct. 808, 818, 172 L.Ed.2d 565 (2009)).

Burke has alleged violations of his First, Fourth, Fifth, and Fourteenth Amendment rights. Burke has not provided any evidence that his clearly established constitutional rights

were violated, as evidenced in the sections below. Therefore, the Court holds that all Defendants are entitled to qualified immunity.

### C. Count II: First Amendment Retaliation Violations

In Count II, Burke claims that Defendants violated his First Amendment rights because 1) the grievance system was ineffective or he was denied access to it; 2) defendants threatened him with rape to deter him from filing grievances; and 3) defendants retaliated against him because of his religion and Kosher diet preference.

#### 1. Access to the Grievance Process

The St. Louis City Division of Corrections has established a policy, 3.3.3 Inmate Grievances (ECF No. 111-6). This policy requires that inmates submit an IRR. The policy provides that certain issues are "non-grievable," *i.e.*, cannot be addressed within the inmate grievance system. Such non-grievable issues include policies and procedures of the Division of Corrections, conditions not affecting the inmate personally, and frivolous or repetitive complaints. If the inmate is dissatisfied with the outcome of the IRR process, he is provided with a grievance form and may submit that form within five business days.

Burke has provided no evidence that he was improperly denied access to the grievance system. Rather, the evidence shows that Defendants Weber and Fields consistently responded to Burke's complaints and requests. Burke was denied grievance forms for non-grievable issues (such as the strip search policy), in accordance with the grievance policy. However, the denial of the grievance forms under such conditions is not an unconstitutional denial of access to the grievance process. Moreover, during his incarceration at MSI, the evidence demonstrates that

Burke abused the grievance system by repeatedly submitting frivolous and repetitive grievances and by sending a folded, full food try to Weber. As a result, the Court holds that Burke cannot establish that he was unconstitutionally denied access to the grievance process.

### 2. Retaliation against Burke

In order to demonstrate retaliation in violation of the First Amendment under 42 U.S.C. § 1983, Burke must "show (1) he engaged in a protected activity, (2) the government official took adverse action against him that would chill a person of ordinary firmness from continuing in the activity, and (3) the adverse action was motivated at least in part by the exercise of the protected activity." *Revels v. Vincenz,* 382 F.3d 870, 876 (8th Cir. 2004) (citing *Naucke v. City of Park Hills,* 284 F.3d 923, 927–28 (8th Cir. 2002)); *Spencer v. Jackson Cty. Mo.*, 738 F.3d 907, 911 (8th Cir. 2013). The retaliatory conduct itself need not be a constitutional violation; the violation is acting in retaliation for "the exercise of a constitutionally protected right." *Cody v. Weber,* 256 F.3d 764, 771 (8th Cir.2001) (citing *Madewell v. Roberts,* 909 F.2d 1203, 1206–07 (8th Cir.1990)); *Spencer*, 738 F.3d at 911.

Burke alleges that Defendants retaliated against him because of his use of the grievance process, his religion, and in retaliation for his complaints that Rucker threatened to have him raped.

The Court holds that Burke's allegations against Defendants are not supported by the evidence. First, the Court holds that there is no evidence of any adverse action against Burke. Likewise, there is no evidence that any actions of Defendants were motivated by any intent to chill his attempts to engage in any protected activity. As previously discussed, the evidence

before the Court is that he was allowed to use the grievance system and that Defendants responded to and addressed his complaints.

Further, Burke's claims of religious retaliation are not supported by the evidence. On December 17, 2014, Burke was approved by Dr. Mallard (employee of Corizon, a third-party contractor for medical services at MSI) to receive kosher meals in accordance with Division of Corrections policies. Burke's authorization to receive kosher meals was revoked on February 17, 2015 by Dr. Mallard because Burke requested diets other than kosher and refused to eat kosher meals. Thereafter, Burke was re-approved for kosher meals, and he continued complaining about them as of late March 2015. Exhibits filed with Burke's Complaint also indicate that he was receiving kosher-certified meals. In any event, Burke has provided no evidence that he followed the proper procedure to request kosher meals after Dr. Mallard revoked his authorization. *See* ECF No. 111-13, City 0168-§VII(C)(2) ("Inmates requesting special diets for religious purposes must complete a Special Diet Request Form with the unit caseworker. The unit caseworker will forward the request to the Division Chaplain.").

The Court also holds that the undisputed evidence shows that none of the named Defendants were responsible for approving or disapproving requests for kosher diets. Dr. Mallard and Reverend Barr were the only people who could approve religious diets. Defendants, in their individual capacities, cannot be held liable for the actions of other people. Similarly, Burke's claim that Fields and Edwards allowed and A'viand employee to prepare "phony" kosher meals "for the purpose of retaliation for the exercise of plaintiff's religion," lacks any evidentiary support. Again, Burke cannot make Defendants liable for the actions of other individuals.

The Court further holds that Burke has provided no evidence that Rucker made any rape threats to Burke or forced him to stand while eating. Defendant Rucker denies those accusations, and Burke has not identified any witnesses to this alleged threat. Burke cannot produce any evidence that any defendant was motivated by a retaliatory motive. Therefore, the Court holds that Burke cannot carry his heavy evidentiary burden to establish that Rucker threatened him as a matter of law. *See Turner v. Mull*, 997 F. Supp. 2d 985, 996 (E.D. Mo. 2014), *aff'd*, 784 F.3d 485 (8th Cir. 2015) ("Plaintiff's conclusory allegations that Thebeau ordered the cell search and the search was prompted by Thebeau's retaliatory intent are insufficient to support his retaliation claim under § 1983").

Burke also asserts retaliation claims against Defendants Fields and Adeoye, claiming that they retaliated against him with a "bogus disciplinary report and predetermined punishment" of administrative segregation. The Court holds that Burke's mere conclusory statements and legal conclusions that this was done "as a vehicle to retaliate against plaintiff for engaging in protected conduct of filing of grievances" do not give rise to a cause of action. Burke has not alleged any facts and can produce no evidence to support his assertion that his confinement to administrative segregation was motivated by his filing of grievances. *See Turner*, 997 F. Supp. 2d at 996; *Niewind v. Smith*, No. 14-CV-4744 (DWF/HB), 2016 WL 3960356, at *6 (D. Minn. May 24, 2016), *report and recommendation adopted,* No. 14-4744 (DWF/HB), 2016 WL 3962852 (D. Minn. July 20, 2016) (granting summary judgment in favor of Defendants where there was no evidence to support the plaintiff's allegations that he was threatened and disciplined for writing a threatening kite).

The Court holds that the evidence is that Burke's disciplinary reports were generated by correctional officers who are not Defendants in this lawsuit and there is no evidence that the

allegations in the reports were unsubstantiated or false. Rather, Burke admitted that he "intentionally disobeyed an officer's order during the strip search process" which resulted in one of the disciplinary reports.

Therefore, the Court holds that Burke's conclusory statements are insufficient and his retaliation claim fails. Burke cannot establish any adverse actions of Defendants were the result of Burke's protected activity. Because Burke cannot produce any evidence to support his claims that Defendants violated Burke's rights under the First Amendment, the Court grants summary judgment to Defendants.

### D. Count III: Fourth Amendment Violations

Burke alleges a violation of the unreasonable searches clause of the Fourth Amendment, claiming that strip searches at MSI were conducted within view of other inmates and an unsanitary manner.

"Generally speaking, '[t]he Fourth Amendment does not require officers to use the least intrusive or less intrusive means to effectuate a search but instead permits a range of objectively reasonable conduct.'" *Story v. Foote*, 782 F.3d 968, 972 (8th Cir. 2015) (quoting *Richmond v. City of Brooklyn Ctr.*, 490 F.3d 1002, 1009 (8th Cir. 2007)). In *Franklin,* however, the Supreme Court held reasonable a practice of conducting visual body-cavity searches within view of five inmates, at least where the record did not support a finding that a less public means of searching was consistent with institutional security. *Franklin v. Lockhart*, 883 F.2d 654, 656-57 (8th Cir. 1989). The Ninth Circuit similarly upheld body-cavity searches conducted in a "sally port" area that was visible to other inmates and to female officers working in a "control bubble," at least

where there were no ready alternatives that would enhance privacy without compromising security or increasing cost. *Michenfelder v. Sumner,* 860 F.2d 328, 333 (9th Cir.1988).

The Court holds that the strip searches at MSI are conducted in a reasonable manner for legitimate security purposes. Defendants have averred, and Burke has not been able to dispute, that "[t]he primary goal of the strip search policy is to locate and seize contraband in order to ensure the safety and security of the facility, the Correctional Offices, and the inmates. There is no alternative to the strip search policy." (ECF No. 111-15, ¶22). Defendants stated that privacy "[p]artitions are not provided [during strip searches] to ensure the safety and security of the Correctional Officers conducting the searches." (ECF No. 111-15, ¶21). Burke has not alleged "that a more private, yet equally secure and cost-effective means of conducting the body-cavity inspection was readily available to the officers." *Story*, 782 F.3d at 972. "The Supreme Court, moreover, has not clearly established that the presence of other inmates renders a body-cavity search unreasonable." *Story*, 782 F.3d at 972. Therefore, the Court holds that Burke's rights were not violated by routine strip searches in front of other inmates, also being searched. Burke has failed to allege any harm suffered as a result of the strip searches, that they were conducted in an unsanitary manner, or that any abusive or inappropriate tactics were utilized during the search. The Court holds that the strip searches were not unreasonable under the Fourth Amendment and grants summary judgment in favor of Defendants

### E. Count IV: Due Process Violation of the Fifth Amendment

Burke attempts to bring a Fifth Amendment claim against Defendants, who are employees of the City of St. Louis, not the Federal Government. Burke's claim fails as a matter of law because a state actor cannot be liable for a Fifth Amendment violation. *See Barnes v. City of Omaha*, 574 F.3d 1003, 1006, n.2 (8th Cir. 2009)("The Fifth Amendment's Due Process

Clause applies only to the federal government or federal actions, and the Plaintiffs have not alleged that the federal government or a federal action deprived them of property."); *See Dusenbery v. United States,* 534 U.S. 161, 167, 122 S.Ct. 694, 151 L.Ed.2d 597 (2002) ("The Due Process Clause of the Fifth Amendment prohibits the United States, as the Due Process Clause of the Fourteenth Amendment prohibits the States, from depriving any person of property without 'due process of law.'"); *Junior Chamber of Commerce of Kansas City, Mo. v. Mo. State Junior Chamber of Commerce,* 508 F.2d 1031, 1033 (8th Cir.1975) (recognizing that a "federal action" is necessary "before there is any deprivation of due process in violation of the fifth amendment"); *Riley v. Camp*, 130 F.3d 958, 972, n.19 (11th Cir. 1997) ("The Fifth Amendment obviously does not apply here-the acts complained of were committed by state rather than federal officials."); *Wrinkles v. Davis*, 311 F. Supp. 2d 735, 738 (N.D. Ind. 2004) ("The Fifth Amendment's due process clause applies only to acts of the federal government and does not limit actions of state officials."). Therefore, the Court grants summary judgment in favor of Defendants on Count IV.

### F. Count V: Deliberate Indifference to Safety and Health

The Court holds that Burke has not identified how Defendants were deliberately indifferent to any substantial risk to his health or safety. "[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S. Ct. 1970, 1979, 128 L. Ed. 2d 811 (1994); *Saylor v. Nebraska*, 812 F.3d 637, 644 (8th Cir. 2016) (prison official must know "of and disregards a serious medical need or a

substantial risk to an inmate's health or safety") (internal quotation omitted). Rather, the evidence before the Court is that Burke was not exposed to any substantial risks to his health or safety while at MSI. Burke received adequate nutrition and medical treatment. Any problems with the heating and plumbing systems were repaired within a reasonable amount of time. Insect extermination services were regularly conducted. Burke has presented no evidence that he suffered any significant harm to his health while incarcerated at MSI. The Court holds that the symptoms that Burke complains of in his pleadings (e.g., interrupted sleep, aches and pains, mosquito bites, constipation, and commons colds) are not serious risks to his health and do not constitute a constitutional violation as a matter of law.

## G. Count VI: Custom and Usage

Burke purports to state a claim for custom and usage. However this is not a cause of action. *See Tr. v. Higginbotham*, No. 4:09CV591 AGF, 2009 WL 1650031, at *2 (E.D. Mo. June 12, 2009) ("Plaintiff's claim that he is suing St. Louis County 'on the theory of custom and usage' is conclusory and fails to state any facts"). Nevertheless, assuming the Burke is attempting to state a *Monell* claim, then that cause of action also fails. *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694, 98 S. Ct. 2018, 2037–38, 56 L. Ed. 2d 611 (1978) ("a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983"). Because none of the Defendants in this case are municipal entities, *Monell* is inapplicable and the Court grants summary judgment in favor of Defendants.

## H. Count VII: Violation of Equal Protection and Due Process Under the Fourteenth Amendment

In Count VII of his Complaint, Burke alleges violations of his due process rights under the Fourteenth Amendment. Burke alleges, "Plaintiff is being denied equal protection and due process of law as more fully described in the above paragraphs." (Ex. N, ¶154). Although Burke fails to specifically articulate how his Fourteenth Amendment rights were violated, the Court construes Burke's Complaint liberally and addresses Burke's possible claims.

### 1. Burke's Substantive Due Process Rights

The Fourteenth Amendment guarantees "[s]ubstantive due process[, which] prevents the government from engaging in conduct that shocks the conscience or interferes with rights implicit in the concept of ordered liberty." *Weiler v. Purkett,* 137 F.3d 1047, 1051 (8th Cir.1998) (en banc); *Moran v. Clarke,* 296 F.3d 638, 643 (8th Cir. 2002). To that end, the Fourteenth Amendment prohibits "conduct that is so outrageous that it shocks the conscience or otherwise offends 'judicial notions of fairness, [or is] offensive to human dignity.' " *Id.* (quoting *Weimer v. Amen,* 870 F.2d 1400, 1405 (8th Cir.1989)) (alteration in original). Burke "must first demonstrate that he was deprived of life, liberty or property by government action." *Phillips v. Norris,* 320 F.3d 844, 846 (8th Cir. 2003)(citing *Singleton v. Cecil,* 155 F.3d 983, 987 (8th Cir.1998); *Beverati v. Smith,* 120 F.3d 500, 502 (4th Cir.1997)).

Construing his Complaint liberally, Burke attempts to allege that he was deprived of a liberty interest when he was confined to administrative segregation for 34 days. The Eighth Circuit has "consistently held that a demotion to segregation, even without cause, is not itself an atypical and significant hardship." *Phillips v. Norris,* 320 F.3d 844, 847 (8th Cir. 2003). "Thus, in order for [Burke] to assert a liberty interest, he must show some difference between his new

conditions in segregation and the conditions in the general population which amounts to an

atypical and significant hardship." *Phillips*, 320 F.3d at 847. Plaintiff was kept in administrative

segregation for 34 days, from December 17, 2014 through January 20, 2015. This brief period of

Administrative Segregation does not implicate Burke's liberty rights. Likewise, Burke cannot

produce any evidence to substantiate his allegations that Defendants Adeoye or Fields charged

him with "bogus disciplinary reports and predetermined punishment". (ECF No. 111-16, ¶113).

Instead the Court holds that the evidence is that the disciplinary reports were substantiated and

his punishment was determined after his hearing. (ECF No. 111-14). The Court holds that

Defendants were acting within their constitutional limits when they placed Burke in

administrative segregation.

The Court also could construe Burke's complaints about the conditions at MSI as stating

violations of his Fourteenth Amendment rights:

> The Eighth Amendment to the United States Constitution prohibits "cruel and
> unusual punishments." U.S. Const. amend. VIII. "[T]he treatment a prisoner
> receives in prison and the conditions under which he is confined are subject to
> scrutiny under the Eighth Amendment." *Helling v. McKinney,* 509 U.S. 25, 31,
> 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993). These conditions include measures taken
> to guarantee the safety of inmates. *See Farmer v. Brennan,* 511 U.S. 825, 832–33,
> 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Because Kahle was a pretrial detainee at
> the time of the alleged violation, her § 1983 claim is not analyzed under the
> Eighth Amendment, but instead under the Fourteenth Amendment's Due Process
> Clause. *See Owens v. Scott County Jail,* 328 F.3d 1026, 1027 (8th Cir.2003). This
> makes little difference as a practical matter, though: Pretrial detainees are entitled
> to the same protection under the Fourteenth Amendment as imprisoned convicts
> receive under the Eighth Amendment. *See Butler v. Fletcher,* 465 F.3d 340, 345
> (8th Cir.2006).

*Kahle v. Leonard*, 477 F.3d 544, 550 (8th Cir. 2007). Therefore, the Court evaluates Burke's

Fourteenth Amendment claims for unconstitutional prison conditions under same test for Eighth

Amendment claims for cruel and unusual punishment. The Constitution "does not mandate

comfortable prisons," *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981), and only those

- 17 -

deprivations denying "the minimal civilized measure of life's necessities," *id.,* at 347, are sufficiently grave to form the basis of an Eighth Amendment violation. *Wilson v. Seiter*, 501 U.S. 294, 298 (1991). The Court finds no evidence that Burke was denied the minimal civilized measures of life's necessities or that Burke experienced any substantial risks of harm. Burke has presented no evidence that the conditions at MSI were constitutionally inadequate.

In addition, Burke makes the argument that the food provided was constitutionally inadequate. "One constitutional protection retained by the prisoner is the right to an adequate diet." *Burgin v. Nix*, 899 F.2d 733, 734 (8th Cir. 1990) (citing *Campbell v. Cauthron,* 623 F.2d 503, 505 (8th Cir. 1980)). "Because control of the administrative details of a prison remains exclusively in the hands of prison officials, … control of the diet is within their discretion, assuming it is adequate." *Burgin*, 899 F.2d at 734 (citing *Goff v. Menke,* 672 F.2d 702, 705 (8th Cir. 1982)). The Court finds no evidence that MSI provided constitutionally inadequate meals to Burke. Although Burke has alleged he lost weight while incarcerated, his medical records show that he maintained his approximate weight. *See* ECF No. 111-10. Burke's weight ranged from 176 to 185 pounds from November 2014 through February 2015. *Id.* Burke cites to no evidence that inadequate nutrition caused him any vision problems. *Id.*; *see Berry v. Brady*, 192 F.3d 504, 508 (5th Cir. 1999) ("Berry has not alleged any specific physical harm, other than hunger pains. Neither has Berry claimed that he lost weight or suffered other adverse physical effects or was denied a nutritionally and calorically adequate diet, nor has he alleged having his health put at risk. Therefore, his allegations do not rise to the level of an Eighth Amendment violation."). The Court holds that occasional vomiting or constipation cannot constitute a "substantial risk of harm" as a matter of law. Moreover, Burke has not demonstrated that Defendants were

responsible for the preparation of Burke's food. Therefore, Burke's claims regarding supposedly inadequate food fail as a matter of law.

The Court also holds that the conditions in the dorms and cells at MSI were constitutional. Burke complains about malfunctioning of the heating and cooling equipment, constant lighting, excessive noise, and exposure to raw sewage due to leaking toilets and urinals. However, none of these described issues rise to the level of a constitutional deprivation. *See Wilson v. Seiter*, 501 U.S. 294, 300, 111 S. Ct. 2321, 2325, 115 L. Ed. 2d 271 (1991) ("if a prison boiler malfunctions accidentally during a cold winter, an inmate would have no basis for an Eighth Amendment claim, even if he suffers objectively significant harm"); *Hutchings v. Corum*, 501 F. Supp. 1276, 1292 (W.D. Mo. 1980) ("the problem of the spillage of sewage-laden water during performance of the frequent repairs on the plumbing system and the resulting leakage of such material into the cells below does present an issue of constitutional proportions"); *Hutchings*, 501 F. Supp. at 1293 ("Although the lights are left on all night and there is a high noise level at night, these are not per se unconstitutional conditions."); *O'Leary v. Iowa State Men's Reformatory*, 79 F.3d 82, 84 (8th Cir. 1996) (quoting *Farmer*, 511 U.S. at 837 ( ("The fact that plaintiffs suffered pain and discomfort is insufficient to prove" prison officials were "deliberately indifferent to 'an excessive risk to inmate health or safety.'")); *Smith v. Copeland*, 87 F.3d 265, 268 (8th Cir. 1996) (exposure to raw sewage for four days "amounts to a *de minimis* imposition and thus does not implicate constitutional concerns"). Likewise, the Court holds that Burke's exposure to secondhand smoke does not constitute a constitutional violation of his due process rights. Burke has not alleged that MSI officials refused to enforce a smoking ban or that Burke sought any medical attention as a result of MSI officials refusing to enforce a smoking ban. *Cf. Weaver v. Clarke*, 45 F.3d 1253, 1256 (8th Cir. 1995) (On a motion

to dismiss, the Eighth Circuit held "the complaint portrays the prison officials as consistently unwilling to enforce the smoking ban in Weaver's room and repeatedly unresponsive to any of Weaver's requests and protests. We conclude that Weaver has alleged deliberate indifference to his existing serious medical needs and thus has alleged the violation of a constitutional right."). In addition, Burke's medical records indicate that he is/was a drug user and cigarette smoker, who smoked about ten cigarettes per day. *See* ECF No. 111-10. Thus, the Court holds that Burke cannot state a plausible claim for relief based upon his inhalation of second hand smoke for which he did not seek medical treatment and when Burke was a smoker himself.

The Court further holds that Burke's constitutional rights were not violated by the prison officials' alleged failure to provide out-of-cell exercise when he was in administrative segregation. In fact, the Eighth Circuit has held that denial of exercise privileges for thirty-seven days, while an inmate was in administrative segregation, "did not constitute an atypical and significant hardship for [the inmate] in the context of normal prison life." *Phillips v. Norris*, 320 F.3d 844, 847 (8th Cir. 2003).

## 2. Burke's Equal Protection Claim

Burke alleges that "Defendants Fields and Edwards quickly approved other detainees alternative diet requests on religious grounds or otherwise, before plaintiff despite many of the approved detainees arriving and requesting their diet after plaintiff's arrival to the jail." (ECF No. 111-16, ¶90). Burke seems to be alleging that similarly situated inmates were treated more favorably than Burke because their requests were granted more quickly. In the prison context, "[t]he heart of an equal protection claim is that similarly situated classes of inmates are treated differently, and that this difference in treatment bears no rational relation to any legitimate penal interest." *Weiler v. Purkett,* 137 F.3d 1047, 1051 (8th Cir.1998), citing *Timm v. Gunter,* 917 F.2d

1093, 1103 (8th Cir.1990), cert. denied, 501 U.S. 1209, 111 S.Ct. 2807, 115 L.Ed.2d 979 (1991); *Jihad v. Fabian*, No. CIV. 09-1604 SRN LIB, 2011 WL 1641885, at *20 (D. Minn. Feb. 17, 2011). The Court holds that the evidence does not support Burke's equal protection claim. Burke was initially approved for a vegetarian diet on December 9, 2014 (about a month after his arrival at MSI). On December 17, 2014, Burke was approved for a kosher diet. (ECF No. 111-10). Burke has not provided any evidence that any other similarly-situated inmate had his request approved more quickly. In addition, the Court notes that Defendants Fields and Edwards were not responsible for approval of special diet requests. Indeed, the Corizon doctors or the chaplain were responsible for approving such requests. Therefore, the Court holds that Defendants did not violate Burke's equal protection rights as a matter of law.

## I. Count VIII: RLUIPA 42 U.S.C. §2000cc-1

Finally, Burke alleges a claim under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. §2000cc-1, *et seq*. "No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution[.]" 42 U.S.C. §2000cc-1(a). The Court holds that Burke cannot state a claim under RLUIPA because the RLUIPA "does not provide a cause of action against individual defendants in their individual capacities." *Stewart v. Beach*, 701 F.3d 1322, 1334 (10th Cir. 2012) (citations omitted). Burke's claims fail as a matter of law because Defendants are all individual persons sued in their individual capacities only. Therefore, the Court enters summary judgment in Defendants' favor on Count VIII.


## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment (ECF No.

111) is **GRANTED**.

An appropriate Judgment is filed herewith.

Dated this ⊘ th day of September, 2017.

**RONNIE L. WHITE**
**UNITED STATES DISTRICT JUDGE**